# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| Plaintiff ) | |
| ) | |
| -v- ) | Docket No. 3:19CR00173(MPS) |
| ) | |
| ) | |
| **LEE FERGUSON** ) | |
| Defendant ) | |

# MEMORANDUM ON BEHALF OF LEE FERGUSON

# IN AID OF SENTENCING

**ATTORNEYS FOR THE DEFENDANT**

William F. Dow, Esquire
350 Orange Street
New Haven, CT 06503
203.772.3100
wdow@jacobslaw.com

Kenneth Rosenthal, Esquire
One Audubon Street, 3rd Floor
New Haven, CT 06511
203.915.4235
krosenthal@gs_lawfirm.com

Date: January 16, 2020

TABLE OF CONTENTS

I.    **Introduction** .    .    .    .    .    .    .    .    .    .    1

II.   **Lee Ferguson's Personal and Professional Background**

    A) Background of Ferguson Companies    .    .    .    .    .    .    3
    B) Lee Ferguson's Growth of Ferguson Companies .    .    .    .    .    6
    C) Testimonials from Employees    .    .    .    .    .    .    9
    D) Lee Ferguson's Community Involvement .    .    .    .    .    .    12
    E) Lee Ferguson's Dedication in His Personal Life .    .    .    .    .    16
    F) Lee's Acceptance of Responsibility and Cooperation with Government .    .    .    18

III.  **The 18 U.S.C. § 3553 Sentencing Factors** .    .    .    .    .    .    20

    A) Lee's History and Characteristics Support a Below Guidelines Sentence    .    .    21
    B) The Nature and Circumstances of the Offense    .    .    .    .    23
    C) Considering the Sentencing Guidelines    .    .    .    .    .    .    28
        1. The Advisory Guidelines Range Does Not Reflect a Fair Sentence .    .    29
        2. The Court Should Adopt the Agreed-Upon CHC I Set Forth in the Plea Agreement    .    .    .    .    .    .    .    30
        3. Lee Ferguson's Age Warrants a Downward Departure or Variance .    .    31
        4. Lee's Cooperation with the Government and Efforts to Address his Substance Abuse Problem Warrant a Downward Variance    .    .    33
    D) The Remaining Sentencing Factors Support a Below Guidelines Sentence    .    .    34
        1. The Unique and Individualized Background and Circumstances of this Offense    .    .    .    .    .    .    .    .    34
        2. Any Sentence of Imprisonment Will Reflect the Seriousness of the Offense and Provide Just Punishment.    .    .    .    .    36
        3. Any Sentence of Imprisonment Will Provide for Adequate Deterrence    .    .    .    .    .    .    .    .    36
        4. Lee Poses No Risk of Offending Again    .    .    .    .    38
        5. The Availability of Other Sentences .    .    .    .    .    38
            a. Support for Community Service Sentences .    .    .    38
            b. Community Service is an Appropriate Sentence for Lee Ferguson    .    .    .    .    .    .    42
        6. The Need to Avoid Unwarranted Sentence Disparities    .    .    48
        7. The Need to Provide Restitution    .    .    .    .    .    47

IV.   **Conclusion** .    .    .    .    .    .    .    .    .    .    47

# I.

## INTRODUCTION

We respectfully submit this memorandum and accompanying documentation on behalf of Lee Ferguson to assist the Court in fashioning an appropriate sentence for him. As the Court is aware, on July 31, 2019 Lee Ferguson pled guilty to a one count information charging him with violation of 18 U.S.C. Sec 1956(a)(1)(A)(i). Through his plea, Lee accepted full and complete responsibility for his actions, which were atypical in an otherwise unblemished professional career. Indeed, in his statement to the Probation Office, Lee wrote:

> I accept full responsibility for what I did. I was wrong. What I did was illegal and improper…I want the Court to know that I have cooperated with the government. I fully acknowledged my guilt and pleaded guilty. I have arranged, at the Government's request, for a retrieval of detailed records and determinations of the exact amounts of restitution due.

Lee Ferguson, at the age of 62, has lived a life characterized by hard work, dedication to his family, friends and employees and commitment to his community. As will be detailed within, Ferguson Electrical and Ferguson Mechanical, his companies, flourished under his leadership and are recognized as excellent employers in the greater Connecticut area. This offense, which occurred over a five-year period, is the only blemish in his 47-year career. Beginning in 1972 while he was earning his high school degree with a position as stock clerk, he rose through the company to become President in 1983 and owner in 1993. Under his leadership, the companies grew from 19 employees to over 200 today. As a result of this offense, he has resigned his positions at both companies, relinquished ownership, and ceased all involvement with the companies and the employees that have been the mainstay of his existence for the past 47 years. As Lee himself put it in one of the documents submitted to the Court: "I'm a convicted felon. I lost everything. I had to sell my business, which was my life."

As the letters to the Court attest, Lee's character and good works, as a father, an employer and benefactor, spanning more than four decades in the Plainville, Connecticut community in which he has spent his entire adult life, are extraordinary in so many respects.  As a result of this offense, he stands before the Court as a humbled, broken person. Nevertheless, the thoughtful letters written on his behalf by family, friends and, significantly, many employees, describe for the Court the type of life Lee has lived. He is one of those persons who finds it hard to say no when asked for assistance. He has served as mentor to dozens of aspiring tradesmen (and women), and was known as a caring and involved owner.

There is no doubt Lee will never appear before a criminal court again in his life. Given Lee's stellar 47 year career, his many decades of dedication to the betterment of the companies' employees and the greater Plainville community in which they and their families reside, the payment of restitution in full in advance of sentencing and his assistance and cooperation with the Government in the effectuation thereof; his age; and his extraordinary caring and support for others in times of need,  we respectfully submit, pursuant to the factors set forth in 18 U.S.C. § 3553 as addressed below, that the sentence imposed should include a significant downward variance from the advisory Guidelines range.

As will be detailed in this memorandum, Lee has been of major service to the Connecticut community for many decades.  Additionally, Lee and the companies have now entered into a community service partnership with Community Partners in Action (CPA), a 143-year-old Connecticut social service agency that specializes in behavioral reform and reentry services. Lee and the Ferguson companies have established an employment training and apprenticeship program for the CPA clients which has the potential to offer life-changing opportunities for dozens of those clients.

## II.
### LEE FERGUSON'S PERSONAL AND PROFESSIONAL HISTORY

**A) Background of Ferguson Companies**

Lee Ferguson, and Ferguson Electric Company, the company Lee's grandfather Roy T. Ferguson founded in 1925, and his father, Thomas R. Ferguson managed from 1948 to 1983 until Lee assumed full managerial responsibilities, and Ferguson Mechanical, the company Lee founded in 1995, and the town of Plainville, Connecticut, where Ferguson Electric and Ferguson Mechanical have always been located, represent the quintessential story of a family-run business. For the first 20 years of operation, Ferguson Electric was a very small company employing three to four electricians. From 1948 to 1983, under the leadership of Thomas R. Ferguson, the company grew to 20 employees, moving from a small local shop to more of a statewide business. Under Lee's leadership, beginning in 1983, Ferguson Electric continued to expand, joined by Ferguson Mechanical in 1995, to over 200 employees working on projects in four states throughout the Northeast. As the companies grew, serving more customers and hiring more employees, they were not only able to fund additional internal growth, but also to put more money into their surrounding community.  As more people in the Plainville, Connecticut area obtained gainful employment at Ferguson, the local economy strengthened, and, because of Ferguson's philanthropy, local nonprofit organizations also strengthened.

The positive ripple effect of a thriving business can be profound. And Lee Ferguson, for the past three and a half decades, has served at the helm of such a thriving company, supporting and mentoring its growing workforce, establishing a work ethic and reputation for quality performance through his own 24-7 presence and example, and procuring a steady supply of projects on which that workforce and their families have depended for their livelihood for decades and, is some cases, generations. On one level, Lee's accomplishments in growing a

successful business are not unique. Much of what drives the success of the United States economy is well-run, successful family-run and/or small businesses. But, on another level, to the Ferguson Electric and Ferguson Mechanical employees who count on a paycheck every week, to the Ferguson customers who expect and rely on the highest quality of service, and to the local nonprofits who depend on Ferguson's corporate sponsorship to operate and serve their stakeholders, Lee Ferguson's accomplishments are extraordinary. To all who are connected to Ferguson Electric and Ferguson Mechanical, Lee's business success and achievements matter a tremendous amount, and we ask the Court to give what he has accomplished in that regard, for the very employees who are the victims of the offense at issue, serious consideration as the Court decides upon his sentence.

Lee Ferguson, the second child of Thomas and Jacqueline (nee Thompson) Ferguson, was born on April 14, 1957 in New Britain, Connecticut. He has a sister, Dale, who is four years older.  Both Dale and Lee were raised by their mother and father in Plainville, Connecticut, the same town where their mother, maternal grandparents, and maternal great grandparents were born and raised. Plainville is also the town where Lee's paternal grandfather, Roy T. Ferguson, started Ferguson Electric Company. Lee's father was born in Bridgeport, Connecticut and grew up in Torrington, about 40 minutes from Plainville. Lee's parents met when his mother, Jacqueline came to work at Ferguson Electric Company after graduating from high school. While Lee's grandfather started the electric company in 1925, Lee's father, Thomas, started managing the family owned business in 1948 when he was 20 years old.  In the early 1950's, Thomas completed military service in Korea, and upon his return, he met and eventually married Jacqueline in 1953.

4

Lee received his entire education through Plainville's public school system, and he graduated from Plainville High School in spring of 1975.  During his high school years, Lee was an avid fan and participant in car racing. His particular love and skill was in building and racing Open Wheel Modified race cars, and he spent many hours of his high school years racing cars at the Plainville Stadium, which closed in 1980. Lee made the decision to begin his apprenticeship training as an electrician after high school rather than attend a four-year college. Lee had grown up in his parents' electrical business, and he was always passionate about the work. As a matter of fact, Lee's mother, Jacqueline, notes in her letter of support to the Court, "As soon as he was able to walk Lee was in the shop with Tom. Cutting wire, stocking shelves." Ex. A, p. A-003.[1] Lee also worked at Ferguson Electric during his high school years. His mother states, "In his teen years Lee worked in the shop performing pre-fabrication in support of our men in the field." Jaqueline continues, "Lee was a natural mechanic and was drawn to the business. I had hoped that he would go to college, but his heart was in following his father's footstep." A-003.

In Lee's third year of his four-year apprenticeship training program, he and his high school sweetheart, Lori Schaeffer, married on November 25, 1978 and began their life as a married couple in Plainville, the town in which they were both raised. Continuing to work at Ferguson Electric, a year after their wedding, Lee became a licensed, certified electrician. Lori and Lee's first son, Ryan, was born in 1980. The couple went on to have three more sons:

---

[1]This quotation and those that follow are taken from character letters written on Mr. Ferguson's behalf. These letters are attached at Exhibit A, and bates numbered A-001 through A-093. The originals of these letters, along with a bates-numbered copy, will be included with the courtesy copy of this Memorandum that is being fed-exed to the Court, and copied to the U.S. Attorney's office and U.S. Probation, as well.  In addition, included as part of that package, and copies, we will also provide a video of interviews conducted with a number of employees, business associates, family and members of the Plainville community, describing their respective experiences with the Lee Ferguson they have known, in many cases for most of their adult lives.

Geoffrey, born in 1982; Thomas, born in 1983; and Andrew, born in 1985. In 1983, Lee was appointed president of Ferguson Electric and took over management of the firm.

At the time Lee was named president, Ferguson Electric, a family-owned company that had started in 1925 by Lee's grandfather with just two to three electricians, then had between 18 to 21 electricians working solely on jobs in Connecticut.  Under Lee's leadership, the company grew to today's current number of more than 200 employees working on projects in not only Connecticut but also in Massachusetts, Pennsylvania and New York.  In 1995, Lee formed Ferguson Mechanical to handle HVAC and plumbing projects. Now a multi-million-dollar business, Ferguson Electric and Ferguson Mechanical are well respected in the industry with projects ranging from the Mashantucket Pequot Tribal Museum in Ledyard, Connecticut to Clearfield Prison in Mahonoy, Pennsylvania.

**B)  Lee Ferguson's Growth of the Ferguson Companies**

In a New England town of just over 17,700 residents, Lee Ferguson, standing on the shoulders of his father and grandfather, grew Ferguson Electric, and thereafter created and expanded an HVAC affiliate, Ferguson Mechanical, into a successful business from the most humble roots.  Lee worked for decades to create a state-of-the art company that delivers the highest caliber results to a broad customer base, gainfully employs over 200 full-time skilled professionals, provides training for new hires in its state approved apprenticeship programs, pays everyone at prevailing wage while maintaining itself as an open shop contractor, and supports many local charitable causes and events. Following the lead established by his grandparents and parents, Lee made Ferguson Electric and Ferguson Mechanical the companies that they are today, based on three core principles:

1) Provide excellent customer service
2) Treat employees like family members

3)  Give generously to your community

Under the leadership and hard work of Lee Ferguson, Ferguson Electric and Ferguson

Mechanical serve their customer base extremely well. Linda Mattes, currently employed as a

Construction Risk Manager for Alliant Insurance Services, Inc., one of the largest independently

owned insurance brokers in the United States, writes of her time when she worked with Lee at

the start of her career providing Ferguson Electric with risk management programs and solutions.

She states:

> Ferguson Companies enjoyed an excellent reputation. Any broker
> would have been grateful for an opportunity to align themselves
> with such an outstanding company with such fine leadership.

Linda continues, "Ferguson Companies was known to all as a signature account and a

notable force in the trades." She also adds, "[Lee's] leadership, accessibility, and incredible work

ethic formed the foundation allowing Ferguson Companies to be included in the prestigious list

of ENR Top 500 Contractors throughout the country." A-035.

Scott Felladore, who worked at Ferguson Electric as a project manager from 2011 to

2016, recalls how Lee would remind him when they often spoke, usually at the end of the day

when everyone else had left, "…that [Lee] worked a half day, '7 to 7'." A-055.  David Kelley,

who has worked for Ferguson Mechanical for 18 years, repeats this theme of Lee's work ethic

when he notes, "[Lee's] total involvement with his company encourages his employees to work

hard and to the best of their abilities." A-060.  Larry Jacobs, an employee of Ferguson

Mechanical for over 10 years, explains that, "…Lee insists on the highest quality construction,

and I hear on every job since coming to Ferguson, from the State Inspectors our work i[s] second

to none. There is a lot of pride at Ferguson because we are a quality firm." A-072.  Michael

Rose, who has been employed by the company for 17 years, states, "[Lee's] personal dedication

to the business not only cultivated success but also inspired his many dedicated employees to strive for success." A-046.  Dr. Francis P. Camp, a dentist in the town of Plainville for more than 45 years, speaks to Ferguson Electric's well-regarded reputation when he writes, "Through [Lee's] dedication and hard work, he painstakingly and successfully transformed a small 'mom and pop' electrician store into a large multi-service corporation…Lee is well-known and well-respected business man in our community." A-031.  Attorney Michael Daly, who has likewise known Lee for decades, notes that through Lee's dedication and leadership the Ferguson companies have "provided in the past and still provide jobs, [and] financial support for our civic needs," and serve as one of the "pillars of our towns." A-041.

Lee's extraordinary work ethic and leadership vision built the Ferguson companies into the successful, well-respected companies they are today, but Lee would be the first person to tell you their success is not because of him. The companies' success is truly owed to the hard-working, dedicated, skilled employees of the Ferguson companies. Stated within virtually every single letter of support written to the Court on Lee's behalf is how well Lee treats his employees. Most note that he treats his employees with as much care and concern as his own family members. He is called a great boss but also viewed as a co-worker. He had the title of president, but served as a mentor to many – the diametric opposite of an absentee owner or imperious boss; to the contrary, one who led by example, who instilled the devotion to craft for which the Ferguson companies are known, and who valued the growing workforce that his leadership made possible, inspiring them with the faith they could succeed from modest beginnings as he had. Many employees feel he is their friend. He is generous, interested in their personal lives, supportive in times of trouble, and always knows everyone's name. Lee Ferguson created a

working environment that serves the employees well, and his employees' testaments to him prove this time and time again.

### C) Testimonials from Employees

Among the many unique features of this case, the most salient is to be found in the words of the employees themselves. Their testimonials comprise a significant portion if the letters included in Exhibit A. In addition, an excerpted subset from the statements of these men and women, who have known and worked with Lee Ferguson for decades, describing the impact he has had on their lives -- his actions when nobody was looking -- are included separately, and attached as Exhibit B.

The picture that emerges from the accounts of the employees, derived from their working lives with Lee, through good times and bad, says more than any lawyer's words can, about "the history and characteristics" of this 62-year-old man. Thus, Thomas W. Wilt, an employee of Ferguson Electric since 1994, states that Lee's "loyalty to me and my family, dedication to helping me learn skills to make me successful, and general interest in my well-being, all contribute to the reason I have continued to work for him for over two decades." A-045. Ten-year employee, Christopher M. Pivin describes his own story of Ferguson-enabled personal success, from the time he was a young man residing in his mother's basement, to the point, "after . . . working under Lee Ferguson," of buying his first home – a "perfect example of how once can succeed with hard work at Ferguson Mechanical. . . [with] a house, money in the bank, brand new jeep that Lee bought for me, . . . [and] enough to support my mom after my father passed away." A-051.[2]

---

[2] A similar transformation is reported by Kurt Benson:

> I currently hold a Plumbing license, and Medical Gas License, and I am enrolled in a Pipe Fitting Apprenticeship. These are all opportunities forwarded to me through working at Ferguson Mechanical…At thirty two years old I have quite the resume, much more money in

William Joyce, an employee of Ferguson for almost 20 years, vividly recalls the time he first met Lee Ferguson. William had been with the company for only six months when he first met Lee at a job site in Hartford, Connecticut: "Lee walked up to me as I was working, addressed me by name and shook my hand. I was amazed that he knew my name." When William relayed this story to his co-workers, he says, "…none of them were surprised and told me Lee knew all of his employees." A-076.  An employee of Ferguson since 1986, James Battista shares how Lee helped pay for his educational training costs, and states, "Lee has displayed nothing more than dedication to his business and his employees." Recalling a very personal story, James writes, "…he has displayed a history of going out of his way to help employees when they fell on ill times. One example was when Lee Ferguson offered to pay for my brother in law's medical bills after he fell terminally ill." A-073.

Laura Sycz, an employee of the company for over 20 years, describes the time, 19 years ago, when her fiancé passed away unexpectedly leaving her as a single mother of three, "I will forever remember Lee's generosity with continuing to send me weekly paychecks, allowing me as much time as I needed to mourn our loss before returning to work. He did not have to do this, but he did…"  Lee also paid tuition for Laura's oldest son, Kyle, to train to become an electrician. Kyle is now an electrical foreman at Ferguson. A-066.

Ronald Jacquemin started working for Ferguson Electric right out of high school in June of 1984; he states, "Lee is my boss, my friend, my co-worker and has been my mentor…In the late 1980's early 1990's he loaned me money to buy my first home, and helped me with legal issues and fees for my first divorce.  He also assisted with the purchase of my current home." A-069.

---

a retirement fund than most of my peers, and a beautiful home to raise my family in…Where I currently am, in my life, is due to the opportunity Lee Ferguson gave me at such a young age even having only a high school education.
A-080.

And Linda McKim, an employee since 1989: "There is no glass ceiling at Ferguson.  You do your job well you get the job. . .  I can remember at one job meeting a construction company manager was belittling me in front of everyone.  Lee told him I had more knowledge of the electrical work than he ever would.  He has a lot of faith in me which means so much to me. . . . I have only depended on two men in my life.  One was my father Ambrose McKim who passed away when I was 17 years old and the other is Lee Ferguson." A-056-57.

Again, David Kelley, who has worked at Ferguson Mechanical for 18 years, and whose son has now worked for the company for eight years, describes Lee's role as a "constant[] resource for myself and my fellow co-workers;" and further describes his battle with leukemia, during which Lee stood behind him and his family, attending a fundraiser at a local church, and keeping his job open until David returned to full health and full time employment with Ferguson, now more than twelve years ago. A-060.

And again, Joanne Ferguson (no relation), whose husband worked at Ferguson from since before they were married ("my husband wouldn't work anywhere else"), and who describes the role that Lee played in the most trying time of her life, during her husband's sixteen-month battle with stage four stomach cancer, and, following his passing in September 2017, when Lee reached out with ongoing support that she "will never forget" -- "every time we meet I am again reminded of the fact that he really cared about Kenny, and does for Ferguson's workers, their families and this community. .. .  I have heard a lot of stories about a man who does not resemble Lee, told by people who don't know the Lee Ferguson I have had the pleasure of knowing for over forty years." A-021.

And yet again (Tim Pilkington, A-084) ("Lee has always been the type of person who takes his leadership as an owner/employer to a level way beyond the norm. He has always, as

long as I have known him, cared more about his employees, their families, and their general
well-being more than any boss I've ever heard of "). And again (Anthony Doucette, A-068) ("I
remember the first day I started working for Mr. Lee Ferguson. . . . He shook my hand and asked
if I was ready to learn. I said absolutely. . . .  He was always stopping out in the shop. He would
show me hands on how to use a tool or an easier way to complete a task. Teaching me about
important qualities in life and with family. He grew not only to be my employer but also a
mentor").  And again (Brian Ruggles, A-081) ("My own father passed away when I was seven
years old and Lee always told my mother and I that when the time came to be in the trade he
would take me in and teach how to be a great electrician and he in fact did so an he personally
trained me to be what I am today. As I had no father in my teenage years and my early twenties
Lee was very much a mentor of me and keeping me on the right track to a successful life and
career. When I was at some low points in life, he was always there to pick me up mentally,
financially and just great advice on how to stay on the right track. Lee paid for all of my
schooling for my electrical trade license that I got very early in life at just twenty-two years of
age. . . .  Lee has always been known in our town to help local kids learn trade skills and give
them the opportunity to be successful in life when there isn't always much opportunity to do
so").[3]

### D) Lee Ferguson's Community Involvement

Importantly, Lee has clearly fulfilled the third tenet of his family's business maxim by
consistently and generously giving back to his community, which he has done for decades. Lee's
father served as an active volunteer in many of Plainville's civic entities, and Lee has infused his
company with that same spirit of community involvement and support. Just as many speak of

---

[3] Brian concludes: "I am just one of the many people Lee has done this for and I know of so many lives that he has
influenced to become better men and women."

Lee as a kind, caring, decent employer, many also speak of Lee's considerable generosity and altruistic manner to those who approach Lee for charitable donations. Long-time employee, Michael Rose notes, "Lee has a strong sense of community…[he] regularly donates money, services, or use of our facility to a large number [of] charities and nonprofit organizations in our community." A-047. Bob Heslin, Director of Procurement and Facilities at Loureiro Engineering Associates, and who has known Lee since grammar school, states, "Lee's contribution and support in our hometown of Plainville are second to none." A-018.  Long-time Ferguson employee Christine Cajigas writes, "In my many years at Ferguson I have seen Lee donate to many organizations." A-049. Family friend, Connecticut State Representative, and resident of Plainville, William A. Petit, MD notes, "[Lee] has always been an ardent supporter of our small town and has donated and supported many charities and events as his dad had done before him." A-019.  Dr. Francis Camp, a local dentist in Plainville, states, "…[Lee] and his company have made substantial donations and logged countless hours supporting local high school athletics and donating to numerous other charities in our community." Dr. Camp continues, "Everyone in Plainville knows that if your organization needs anything (donations, pro bono electrical work) just call Lee and he will help you." A-031. Lee's third son, Thomas Ferguson, speaks of how his father has carried on as his father taught him, "Lee's father (my late Grandpa Tom Ferguson), has left a legacy of commitment to his community…My dad has mirrored that of my Grandpa in many ways which I have always admired." A-007.  Another long-time employee, Laura Sycz, highlights the Ferguson companies' integral role in the town when she writes:

> It's hard to even remember NOT seeing their name in something when it came to supporting so many organizations within our town…I don't think there is anything that has to do with the Town of Plainville that Lee would ever decline supporting…ever. A-066.

Family friend, then Ferguson employee, Scott Federowicz, states, "Ferguson Electric has supported the community in Plainville for longer than I can remember. Lee has always been proud of his hometown and never turns his back on the community." A-063. Lee's son, Geoffrey Ferguson, continues this theme of charitable giving when he speaks of his father, "I've never met another person with the work ethic, drive to succeed and such a willingness to help those around him as I've seen from my father." A-011.

Under Lee's direction, following is a list of some of Ferguson Electric's charitable work:

- ➢ Little League Baseball
- ➢ The Chamber of Commerce
- ➢ The Rotary Club Scholarship Fund
- ➢ The Petit Family Foundation, including the annual 5K Road Race
- ➢ Plainville Public Schools
- ➢ Plainville Fire Department
- ➢ Plainville Food Pantry
- ➢ Nico's Lemonade Stand for Make a Wish Foundation
- ➢ The Wheeler Clinic
- ➢ Harold Johnson Memorial (fundraising for his children)
- ➢ State of Connecticut 100 Club (since 1983)
- ➢ Plainville Midget Football
- ➢ Plainville Midget Football — Nico Koutazides Training Camp
- ➢ The Hundred Club of Connecticut (charity for surviving spouses and children of first responders)

Ten years ago, Kyle Fasold and his family moved into a home across the street from Ferguson Electric Company. The following year, Kyle's son, Nico, started a lemonade stand to help raise money for Make-A-Wish Foundation of Connecticut. Since the street where Kyle's home and Ferguson Electric are located is a busy thoroughfare, Kyle approached Lee to see if he would mind opening his company's parking lot for people to park their cars safely while buying lemonade at his son's lemonade stand. Kyle writes:

> I'm not sure if Lee knew what he got himself into but 10 years later he is allowing Nico to use his parking lot to park monster trucks, fire trucks and other heavy equipment…to support Nico's Lemonade Stand for make a wish. Without the generosity and support of Lee

> Ferguson we would never have been able to raise almost $100,000 for Make-A-Wish granting 10 wishes to children with life [threatening] illnesses. Apart from the support and friendship that he has given our family there is not one philanthropic event that happens in the greater Plainville community that Ferguson Electric is not involved. He is a pillar of the community and has help[ed] many people and families along the way.

A-016.

Whether requesting a financial contribution or an in-kind donation of labor or equipment, many count on Lee for his unconditional and consistently generous support. Dr. William Petit notes that Lee has supported the Petit Family Foundation's 5K race since 2008 by "allowing us to use equipment and small supplies as well as some of his workers for set-up and electrical work at no charge. We would have struggled with wiring, sound, food and other systems without his support." A-019.

Carla Zettergren Bergenty speaks of Lee's generous support and participation in the many events and programs offered during her tenure on the Board of Directors of the Plainville Community Food Pantry. She states, "Lee has participated in many of these events in the way of donations to our back to school program and our fuel bank program. He has always been very generous in his support." A-026.

Without question, Lee Ferguson is a generous man, committed to his community. Sometimes, like he did for his employee Christine Cajigas, he loans an employee money for a down payment on a car or a home. A-048. Or, as he did for Laura Sycz's son Kyle, and long-time employee James Battista, Lee helps pay apprenticeship tuition costs to help people learn a trade. A-066-67; A-073. He lends employees equipment for personal projects; he helped one employee pay for some of his boat repairs; he allows employees paid time-off to handle personal family issues; he strives to make sure all of his employees remain employed even when the work

flow slows down. And his generosity does not stop at the door of his company; his altruism spreads throughout his community. Examples abound supporting this fact.

### E)  Lee Ferguson's Dedication in His Personal Life

Numerous examples of Lee Ferguson commitment to serving others as a business leader, boss and community member exist and have been well documented in this sentencing memorandum. However, there are two quiet, personal stories that further attest to Lee's true character as an extremely decent, caring, generous human being.  Both of these stories involve private family matters, but they deserve to be told publicly to illuminate, beyond the public figure so many people know and deeply respect, who Lee is at his core.

First, Lee and his significant other, Joanne Erdman, met after both of their respective marriages ended in divorce. Lee and his wife divorced in 1995, and Joanne and her husband's marriage ended around the same time. About a year later, Joanne started working at Ferguson Electric where she and Lee became good friends and eventually started dating. Their children are around the same ages, and throughout the years, Lee, Joanne and all of their children get together often given that everyone gets along very well. Joanne has two daughters, Chrissy, now age 34, who works at Ferguson Electric and Laura, now age 31, who works as a waitress and lives with Joanne. Joanne made the conscious decision, after her divorce, not to remarry, so while she and Lee are a couple, Joanne maintains her own home. Laura, Joanne's second daughter, has been dealing with significant mental health issues since she turned 16 years old, and Joanne has been with her every step of the way to help her navigate her mental health care needs. Joanne will attest to the fact that this has been at times a rough and scary journey with her daughter. She will also share that from the moment she started dating Lee, he has helped care for Laura as if Laura were his own child. Whatever Joanne needs to do in order to support Laura, especially during

frightening times of mental health crises, Lee is by her side. If Joanne needs to take a significant amount of time off from work to help stabilize her daughter's situation, Lee never hesitates to provide Joanne with whatever time or financial support she needs to do so. Lee is as committed to Laura and her care as he is to his own children.[4]

Of course, Lee shows the same level of care, concern and dedication to his sons as he does with Joanne's daughters; however, it is worth noting in particular Lee's significant commitment and critical role in the life of his youngest child, Andrew. Beginning in middle school at the age of 12, Andrew, now age 34, started experimenting with marijuana and alcohol and has, unfortunately, spent the last two decades struggling with substance abuse. But just as Lee has done with Laura and her struggles, Lee has *never* given up on Andrew and has worked consistently to help him find his way to sobriety and a substance-free life. Twenty-two years is a long time for anyone to deal with addiction, and it is a long time for one's parent to never let go. Lee has not and will not let go of his son.

While in middle school, Andrew recalls how his father, "…drove out to a friend's house and picked me up because he knew I was in a negative environment." A-008. To help Andrew get away from the negative influence of these friends, Lee took him out of the Plainville schools and sent him to a school in Avon, Connecticut. He encouraged Andrew to pursue athletics, and Andrew notes that his father, "…was an ever-present figure at my games and meets." Lee sent Andrew to sports camps and hired athletic trainers to help Andrew develop into an even better athlete, but after time, Andrew found his way back into the world of drugs and alcohol and started abusing substances yet again. But again, Lee did not walk away from his child. Even while Andrew was in college and actively using substances, Lee tried to help Andrew by

---

[4] Those ongoing instances are most recently reflected in the notes of Lee's own current counseling, describing an incident in November. *See* sealed Ex. 1, p. 11, accompanying Motion to Seal submitted herewith.

employing him at his company. For many years, Lee's attempts to help his son have failed, but Lee Ferguson will not abandon his son. Both he and Andrew know that Andrew needs more professional care to end his dependency on substances, and Lee will remain with him every step of the way.

As a testament to who Lee Ferguson truly is as a father and as a person, we ask the Court to keep in mind Andrew's letter where he documents time and again the unwavering, steadfast, unconditional, guiding love of his father. His following words bear witness to his father's unfaltering ethos:

> …I put my father through deep pain and sadness[;] from jails institutions, or at the brink of death my father always extended his hand and was willing to discuss a plan of action to help me get sober and back on track. My father never turned his back and always had faith in me — even when nobody else did…I hope this court could match even a fraction of the compassion that [my father] has shown me throughout my life.

A-010.

Andrew's words touch upon the personal bond he shares with his father, but his words also exemplify the bond Lee Ferguson shares with many in his life. Lee Ferguson has helped many get on track for a successful life, never turning his back, always having faith in others' potential.

**F)  Lee's Acceptance of Responsibility and Cooperation with the Government**

As noted in the Presentence Report, Lee has accepted responsibility for his illegal actions, and is genuinely regretful for those actions. PSR ¶¶ 18, 76.  Long-time Ferguson employee Andrew Jeffrey, who has worked for Lee since 2007 states, "While I was surprised to hear of Lee's recent poor decisions, it came as no surprise that he is ready to accept responsibility for his actions." A-074. Edward Pasqua, who has worked as a piping foreman at Ferguson for almost 4 years, also notes this fact in his letter, "…Lee Ferguson has expressed

deep sense of remorse in making such a serious mistake and is ready to pay his de[b]t to society." A-065.  Attorney Michael C. Daly also notes, "Lee has already made significant restitution as I understand and has taken full responsibility for his actions." A-041.

As the PSR further indicates, Lee has also assisted the authorities in the conduct of this matter. PSR ¶ 31. In that regard, in addition to enabling conservation of scarce judicial and prosecutorial resources through his timely plea of guilty, Lee has cooperated with, and assisted in, the Government's investigation and prosecution of the case in other important and telling respects:

> On June 26, 2018, Lee attended a meeting at the U.S. Attorney's Office, and responded in full to the questions posed to him;

> On November 27, 2018, on his instructions, a meeting was arranged between the federal agents and Ferguson company staff, at the Ferguson plant in Plainville, concerning retrieval of data needed for the preparation of the restitution schedule that was subsequently included in Schedule A to the plea agreement;

> On December 20, 2018, the requested data was hand-delivered to the Government, and thereafter supplemented with additional information as required for the Government.

Moreover, as noted above, as part of his recognition and acceptance of responsibility, Lee has resigned from the companies (the companies that "were [his] life"), and fully relinquished his ownership interests, and the restitution called for under the plea agreement has already been paid, in full, in advance of sentencing.

As the Court prepares for sentencing, the conduct at issue must be weighed against all the good Lee has contributed to those around him and to the community at large: as a responsible

father, as a civic-minded citizen of Plainville, as an unwavering source of support at times of

need and hardship, and as a leader, mentor and role model for the Ferguson companies that he

has been responsible for developing into the fixture it has become in the Connecticut economy

and in the lives of the now hundreds of employees and their families over the past three and a

half decades.  As Judge Rakoff has remarked, "This elementary principle of weighing the good

with the bad, which is basic to all the great religions, moral philosophies, and systems of justice,

was plainly part of what Congress had in mind when it directed courts to consider, as a necessary

sentencing factor, 'the history and characteristics of the defendant.'" *United States v. Adelson*,

441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006).

## III.
## THE 18 U.S.C. § 3553 SENTENCING FACTORS

Congress has established a series of factors that district courts are to consider in order to

"impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of

the federal sentencing regime. 18 U.S.C. § 3553(a); *see United States v. Crosby*, 397 F.3d 103,

111–14 (2d Cir. 2005). These factors are:

(1)     the nature and circumstances of the offense and the history
        and characteristics of the defendant;
(2)     the need for the sentence imposed—
        (A)     to reflect the seriousness of the offense, to promote respect for
                the law, and to provide just punishment for the offense;
        (B)     to afford adequate deterrence to criminal conduct;
        (C)     to protect the public from further crimes of the defendant; and
        (D)     to provide the defendant with needed educational or vocational
                training, medical care, or other correctional treatment in the
                most effective manner;
(3)     the kinds of sentences available;
(4)     [the applicable Sentencing Guidelines range] . . .
(5)     any pertinent policy statement [issued by the Sentencing Commission] . . .
(6)     the need to avoid unwarranted sentence disparities among defendants
        with similar records who have been found guilty of similar conduct; and
(7)     the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). As discussed below, these purposes of federal sentencing and the

considerations behind them would best be furthered by a sentence below the advisory Guidelines range.

### A)   Lee's History and Characteristics Support a Below Guidelines Sentence

18 U.S.C. § 3553(a)(1) requires the Court to consider "the history and characteristics of the defendant." As the discussion of Lee's personal background above and the more than fifty letters of support submitted on his behalf demonstrate, Lee's caring and support for those in need, contributions to his community, extraordinary work ethic, and dedication not only to his own family but to his employees and their families, set him apart. The present offense occurred and must be considered against what the PSR notes to be an otherwise law-abiding life and stellar reputation. The good deeds and positive contributions that have comprised Lee's adult life over the past four decades, and through which his well-deserved reputation was earned, are crucial to determining the appropriate sentence.

As the PSR notes, Lee came from modest origins, living with his parents and sister in an 800 square foot home until the age of eleven. PSR, ¶¶ 36-37.  According to his mother, he exhibited a determination to follow in his father's footsteps from almost the time he could walk, and joined the company immediately after graduation from Plainville high school, staring in prefabrication support, earning master electrician licenses in several states at an early age, and taking charge of the company at age 26.  From that time, more than thirty-five years ago, until the present matter, the focus of Lee's life, on a daily unwavering basis, has been the operation of the Ferguson companies, and the mentoring and gainful employment of its ever-expanding workforce.  His dedication to that task, and to the employees, their families and the community of which he and they were such an integral part, was in large measure the reason for the success and expansion of the companies, to a workforce nearly tenfold what it had been, in just a decade

and half after Lee took charge.  That same dedication and singular focus involved pressures and required sacrifices that, in retrospect, according to the person who has known Lee the longest, extracted a very heavy personal toll. *See* letter of Jacqueline Ferguson, A-003-006.

Notwithstanding those pressures, with a determination to succeed, bidding prevailing wage jobs to ensure top pay and continued employment for the employees, Lee grew and mentored a workforce drawn largely from the Plainville community in which he himself had his roots, as reflected in the scores of testimonials described above and submitted herewith. As likewise confirmed in those testimonials, through it all, from the time he assumed leadership at age 26, Lee consistently exhibited the support and caring for others – employees, family and community – particularly in times of need, that have been his hallmark.

For those who have been benefitted from the full-time employment with Lee over these decades, where they were able to learn a trade and become licensed in a field, they were enabled to not only avoid poverty but to propel themselves, and their families, into a life of financial stability and independence. In their letters of support for Lee, dozens of Ferguson employees document this exact career trajectory. And it is fair to say that their story is the story of most of Ferguson's employees. Their stories of financial success are unfolding daily because over 35 years ago, Lee Ferguson inherited a relatively small "mom and pop" electrical company, and grew it into the thriving business it is today, with over 200 employees achieving their life dreams, most with only a high school diploma in their hands when they joined the firm. Lee Ferguson is not only a generous man; he is also the man who has laid the foundation for many individuals and their families to build their own version of the American Dream.

It is that "history", and the leadership, mentoring and support that Lee Ferguson has provided to the workforce that best knows his dedication and "characteristics", that provide the

context (the "particulars", 18 U.S.C. § 3553(a)) in conjunction with which the misconduct at issue should be considered in determining the sentence to be imposed.

**B)  The Nature and Circumstances of the Offense**

Through his plea agreement, Lee Ferguson has accepted total and complete responsibility for his illegal action. As noted in the Presentence Report, he is "genuinely regretful of his actions." PSR, ¶ 76. He has cooperated with the Government, and already paid the full amount of restitution set forth in the plea agreement even before sentencing. The discussion that follows is offered to assist the Court in understanding what Lee Ferguson did, and, also important, what he did not do.  It is not intended to diminish his offense behavior, but to place it in context of the Ferguson companies and their administration of employee benefit funds.

During the period in question (2013-2017), Ferguson Electric and Ferguson Mechanical consisted of a workforce of approximately 200 employees. The Companies were, and remain, the largest employer in the Plainville, Connecticut area, and are among the largest of the remaining open shop (non-union) employers in the Connecticut construction industry. Their predominant book of business (over 95%) is comprised of public works projects for Connecticut state and local governmental entities, and they have served as the electrical and mechanical (HVAC) subcontractor of choice on some of the largest such projects, including  Mashantucket Pequot Museum and Research Center, UConn Health Center Research Tower, Waterbury City Hall, Naugatuck Valley Community College, and Pfizer Global Research and Development Center. As noted in the comments of the employees quoted above, the Ferguson Companies have a reputation in the field that is "second to none," with well-trained, highly motivated craftsmen who share in the attention to detail, devotion to quality and impeccable work ethic that Lee

Ferguson has instilled and for which he has served as role model and mentor throughout his decades in leading the Companies and its employees, as they likewise eloquently describe.

Construction companies that perform services on public works projects are subject to special requirements that prescribe wage and fringe benefit payments, commonly referred to as "prevailing wage regulations." A number of states, including Connecticut, have their own prevailing wage legislation and regulations applicable to public works projects undertaken within their jurisdictions. While these state prevailing wage laws vary in many respects, most of them provide a basic framework under which a prescribed wage is to be paid by non-union contractors on public works projects, broken down by locality and job classification, and almost invariably keyed to collective bargaining rates in effect in that locality at any given time.

In most jurisdictions with such laws, including Connecticut, the prevailing wage rate is made up of two components – a per hour base rate paid out as wages, and a separate fringe benefit rate, consisting of an annualized per hour value for qualified employer-provided benefits. This case is concerned with the fringe benefits component only.[5]

An employer may discharge obligations under the fringe benefit component through "creditable costs" incurred for various categories of benefits.  In Connecticut, the eligible fringe benefit costs included health care costs, life and disability insurance, apprentice training, holiday and vacation benefits ("paid time off" or "PTO"), and employer pension contributions.  In

---

[5]Controversies with respect to prevailing wage compliance almost invariably involve the fringe benefit component of the prevailing wage law. Unlike direct wages, the determination of whether and to what extent a given employer's fringe benefit expense qualifies as a 'creditable cost', and the "annualization" and calculation of the per hour equivalency of any given fringe benefit cost, can be subject to interpretation in a manner not present in the case of direct wages – a "tangled web" with respect to merit shop, unlike union, employers. *See* Direct Advisors, *Working the Fringe* (Sept. 2015), p.5. https://cafe.cfma.org/HigherLogic/System/DownloadDocumentFile.ashx? Document FileKey=076b9b4d-50cf-45e8-a5f6-23a58adc2cd5. Moreover, in contrast to the equivalency for direct wages paid to collective bargaining and open shop employees, there is a significant disparity in the administration and payout of fringe benefits as between collective bargaining employers and open shop employers. *See* sealed exhibit 2, accompanying Motion to Seal submitted herewith.

addition, a Connecticut Department of Labor publication entitled "A Guide to Prevailing Wage

Laws," published by the DOL in 2004, and reaffirmed in later DOL promulgations, stated that

"costs . . . incurred by a third party administering an insurance or pension plan" may be

creditable as well. *See* Ex. C.[6]

During 2013-2017, the prevailing wage rates on public works projects in Connecticut

totaled upwards of $70 per hour, depending on job classification, including a fringe benefit

component totaling upwards of $30 per hour. In satisfying the fringe benefit number, the open

shop employer was allowed a credit for the per-hour equivalent of costs it incurred in providing

employee health care coverage, holiday and vacation benefits, and the other "creditable" benefits

listed above. The balance remaining, after deducting these creditable costs, would be paid into

the individual employee pension accounts, under the open shop employer's pension plan

established in accordance with the pension requirements to which open shop employers, unlike

union employers, were subject.[7]

---

[6]In 2011, and again in 2012, the Connecticut Department of Labor audited the "administrative fees" the Ferguson companies had paid to an entity known as TPA of Connecticut, LLC and had counted as a creditable cost toward the fringe benefits component of the companies' prevailing wage obligations, and found Ferguson "all in compliance." In late 2016, however, the Connecticut Department of Labor determined that the administrative fee credit was not acceptable and issued a demand for repayment. *See* M. Fitch, *Connecticut Dept. of Labor Oversight Spurs Lawsuit Against State Contractor*, March 12, 2019.https://yankeeinstitute.org/2019/03/12/the-fitch-files. Although there were some efforts by the Ferguson companies' construction counsel to negotiate a civil resolution, the State of Connecticut Department of Labor forwarded the case to the federal Department of Labor, which had a zero-tolerance policy on administrative fees for benefit plans, resulting in the present prosecution and criminal charges to which Mr. Ferguson has pled guilty.

[7]As noted below, the pension required under prevailing wage law in the case of a non-union employer such as Ferguson was considerably different, and arguably far more beneficial from the individual employee's perspective, than that afforded to employees governed by collective bargaining agreements. *See* p. 30, *infra*. The substantial difference in the terms required for prevailing wage (non-union) pension plans and the terms of the union multi-employer plans, is one among many instances of the arguably disparate effects of prevailing wage legislation. *See generally*, J. McGowan, *The Discriminatory Impact of Union Fringe Benefit Requirements on Nonunion Workers Under Government-Mandated Project Labor Agreements*. http://thetruthaboutplas.com/wp-content/uploads/2012/12/McGowan-Impact-of-Union-Fringe-Benefits-on-Nonunion-Workers-Under-PLAs.pdf.

The offense conduct at issue in this case involves the inclusion of an administrative fee credit in the calculation of the prevailing wage fringe benefits paid to Ferguson employees between 2013 and 2017.  The administrative fees were paid to TPA of Connecticut, LLC on a monthly basis.[8]  Thereafter, as referenced in the stipulation of offense conduct (ECF No. 8, p. 10), funds were transferred from TPA to an entity known as DJS Associates, over which Mr. Ferguson exercised control, and which funds were used for his own personal benefit. *Id*.

As reflected in figures supplied to the undersigned by counsel for TPA, and previously shared with the Government, the costs retained by TPA from the administrative fee payments for 2013-2017 exceeded $1 million dollars of the $3.35 million in total administrative fee deductions.  In addition, the net effect of the admin fee deductions on residual pension contributions for Ferguson employees was partially offset by Ferguson's utilization of self-insured health care coverage, resulting in lower per hour creditable health care costs (compared to the significantly higher costs under outside insurance carriers' rates), with a concomitant increase in the per hour residual pension contribution. *See* November 4, 2019 letter from defense counsel to Probation Officer Collette, ECF No. 23-2, p. 3.[9]  Nonetheless, Mr. Ferguson has

---

[8] TPA was set up by Mr. Ferguson and George Wood, a CPA and former Ferguson employee. Wood served as the full-time employee of TPA. As detailed in the November 4, 2019 letter from defendant's counsel to U.S. Probation Officer Collette, *see* ECF No. 23-2, the services performed by TPA included oversight of both the pension and health care components of the fringe benefits provided to Ferguson's 200 employees, *see id.*, p. 2, n. 3,  as well as the accompanying dental, vision and disability plans provided to employees in both companies, and also included calculation and payment of PTO ("paid time off", i.e.,  holiday and vacation), which was fully creditable under Connecticut prevailing wage regulations.

[9] These health care savings were facilitated by the work of TPA, *see* ECF No. 23-2, p. 2, n. 3, funded by a portion of the admin fee at issue, and redounded to the benefit of the employees.  At the same time, in adopting cost-effective health care insured by the companies themselves, the Ferguson Companies assumed the risk that the reduced per hour health care fringe credit could, in any given year, prove insufficient to cover actual claims.  Thus, in calendar year 2017, the submitted claims exceeded the fringe charges and employee contributions by more than $560,000, requiring the Companies to make up that shortfall from their operating funds, without any additional charges or credits applied to the employees' prevailing wage fringe. ECF No. 23-2, p. 3, n. 4. Notably, the administrative fee language in the DOL guidance cited above, suggesting the allowability of a fringe credit for administrative fees in some cases, was not limited to "pension" administrative costs, but encompassed "costs incurred by a third party administering an *insurance* or pension plan." (emphasis added). See Ex. C, p. C-002.

accepted responsibility and recognizes his criminal responsibility for the full amount of the admin fee credit, and that amount has already been paid in full to each of the employees listed on Schedule A of the plea agreement.

It should be noted that while the administrative fees paid to TPA were found to be improper, contributions to the employee plans by the Ferguson Companies for medical, paid time off and the balance of pension contributions under the fringe were paid as required.  Moreover, a side-by-side comparison of wage and fringe figures for Ferguson employees in the plumbers and pipefitters category (the largest category of Ferguson employees in the predominant "mechanical" side of the business), with the union scale for that same job classification, covering the months of January through May 2016 -- the time period and job classification for which union scale comparison data is available – shows that the Ferguson pension contributions achieved parity with the benchmark union pension allowance, when taking into account the fringe credits for paid time off in the case of Ferguson employees, in contrast to union employees, who receive no paid holidays or vacations. *See* sealed Ex. 2, accompanying Motion to Seal submitted herewith.  Adjusting the Ferguson pension contribution totals to add back the admin fee that has now been paid in restitution, and the fully creditable PTO, the total pension and PTO components of Ferguson fringe package now exceeds the benchmark collective bargaining scale by more than 25%. *Id.*[10]

---

[10] The foregoing is not advanced to seek or obtain any monetary credit or reduction in level of offense conduct or amount of restitution, which, as stipulated in the plea agreement, is based on the full amount of the administrative fees taken, and has already been paid in full, but is offered instead as a  mitigating consideration in examining the particulars of the offense conduct here, and bearing on the requested downward variance from the advisory Guidelines range pursuant to 18 U.S.C. § 3553.  As Judge Underhill (concurring) noted in *United States v. Corsey*, the need to "carefully examin[e]" the circumstances surrounding the particulars of a given case is especially important under U.S.S.G. § 2B1.1, which encompasses a very broad range of conduct. 723 F.3d at 382.

It should also be noted that under the Ferguson prevailing wage pension plan, unlike the union pension, the Ferguson contributions: (i) are paid and funded immediately and in full into individual employee accounts (versus multi-employer union pension accounts, whose deferred and inadequate funding have become a significant economic and political issue); (ii) are fully vested from day one (versus union deferred 5-year vesting); and (iii) are payable immediately upon termination (versus age 65 and 30 years of service prerequisite under union pension, with payout further limited and deferred even then). In fact, these features of the Ferguson pensions, with individual employee account balances amounting to hundreds of thousands of dollars in a significant number of cases, coupled with the positive work environment fostered by management, account for the fact that when presented a choice, qualified tradesmen and laborers have opted for employment with Ferguson, and that attempted collective bargaining drives have been repeatedly rejected by the Ferguson workforce, one of the few remaining Connecticut-based merit employers in the industry.

### C) Considering the Sentencing Guidelines

The Court is required to give consideration to the advisory Guidelines range. But where, as here, the particular sentencing guideline is not the result of the Commission's ordinary "empirical approach," imposing a sentence within the Guidelines range without close analysis can violate Section 3553(a). *United States v. Dorvee*, 616 F.3d 174, 184–87 (2d Cir. 2010); *see Kimbrough v. United States*, 552 U.S. 85, 109–10 (2007) (noting that because the Guidelines for crack cocaine offenses stem from politics, not the Sentencing Commission's expertise, a within-Guidelines sentence "even in a mine-run case" may be "greater than necessary to achieve § 3553(a)'s purposes") (internal quotation marks omitted). The same is true of U.S.S.G § 2B1.1: it is the product of tampering with the Guidelines, not the Sentencing Commission's empirical

study, *see* Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rpt. No. 1 (Oct. 2013), 2013 WL 8171735,  *passim*, compounded by the "bracket inflation" that has resulted from three sets of upward amendments to the loss table that has served to aggravate its "fundamentally flawed" genesis in the first place. *See United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, *J.*, concurring). As a result, the sentencing range provided by U.S.S.G. § 2B1.1 is of "low marginal utility" in determining a sentence that is "sufficient, but not greater than necessary" to meet the purposes of Section 3553(a), and the sentencing Court should accordingly "place greater reliance on the more general considerations set forth in Section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences." *Corsey*, 723 F.3d at 380 (*quoting, in part, United States v. Adelson*, 441 F.Supp.2d 506, 515 (S.D.N.Y. 2006), *aff'd mem.*, 301 Fed.Appx. 93 (2d Cir. 2008)).

### 1.  The Advisory Guidelines Range Does Not Reflect a Fair Sentence

This case provides an illustration of the foregoing limitations.  Absent the multiplier effects of the loss table, Lee's total offense level would be 9.[11] Even without a *Fernandez* reduction in criminal history category, *see* subsection 2, *infra*, Lee's sentencing range would be 6-12 months' imprisonment, and would place Lee in Zone B of the Sentencing Table, authorizing the Court to impose a sentence of probation with intermittent confinement, community confinement, or home detention. U.S.S.G. § 5B1.1(a)(2).  But layering on the Guidelines' "fetish with abstract arithmetic," *Adelson*, 441 F.Supp.2d at 512, under the non-

---

[11] The base offense level is seven, plus a two-level increase for an offense involving more than ten victims, plus a two-level increase because the conviction falls under 18 U.S.C. § 1956, with a two-level reduction for acceptance of responsibility.

empirical calculus of § 2B1.1(b), Lee's offense level more than doubles, and his Guidelines range increases by six to nine-fold (for the maximum and minimum of the range, respectively).

For the reasons set forth hereafter, this rigid calculus, derived from the Guidelines' overstated and arbitrary reliance on loss, results in a sentence that is disproportionate given Lee's personal history and the circumstances of the offense, and substantially exceeds the sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing under § 3553(a).

### 2. The Court Should Adopt the Agreed-Upon Criminal History (CHC I) Set Forth in the Plea Agreement

As noted in the PSR, although rigid scoring of Lee Ferguson's 2010 DUI conviction, including a prison sentence in excess of 60 days, would result (just barely) in a criminal history category of II, the Court may consider a downward departure to CHC I, to give effect to the plea agreement, pursuant to *United States v. Fernandez*, 877 F.2d 1138, 1144 (2d Cir. 1989). PSR, ¶ 69. In *Fernandez*, the Second Circuit observed that "discretionary power to depart from the Guidelines may be especially important" in cases with a plea agreement because otherwise "the widespread practice of plea bargaining [would become] unworkable." *Id*. at 1144. The Court added that in adopting the Sentencing Reform Act, Congress had no intention of weakening the widespread system of plea bargaining, despite the Guidelines' failure to explicitly consider this factor. *Id*.

Moreover, given this relatively old conviction, the absence of any other convictions since 2010, and the connection of that conviction to an alcohol abuse problem that Lee is actively in the process of addressing, *see* January 16, 2020 Motion to Seal, Ex. 1, the level II criminal history category substantially overstates the seriousness of Lee's criminal history and likelihood of committing other crimes, warranting a downward departure pursuant to U.S.S.G. § 4A1.3(b).

Moreover, the de minimis time served for the single prior offense in question is a mitigating factor that can, and arguably should be considered in making the individualized assessment called for by U.S.S.G. § 4A1.3, because the deterrent purposes underlying the use of CHC under the Guidelines in the first place is directly and significantly impacted by the relationship between the length of the prior sentence relative to that produced by application of the CHC score at issue. Where, as here, the prior sentence was a few months only, the upward ratcheting effect of an enhanced CHC score is questionable at best. *See generally, United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001).

On either or both of the foregoing grounds, it is respectfully submitted that the Court should grant a downward departure to CHC I for purposes of any Guidelines sentencing analysis.

### 3. Lee Ferguson's Age Warrants a Downward Departure and/or Variance

As a number of sentencing courts have noted, and the Guidelines themselves recognize, a defendant's age is a factor that a sentencing court can take into account in considering a departure or variance from the mathematical calculus of the Guidelines, and one that the Guideline math does not otherwise reflect. *See United States v. Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993) ("[w]hile awarding defendants generally and this defendant individually some credit for leading relatively crime-free lives, the Criminal History Category of the Sentencing Guidelines does not account for the length of time a particular defendant refrains from criminal conduct, . . . a factor . . . critical to a court's determination of the sentence it should impose, [but one that] the guidelines fai[l] to consider"; granting downward departure based on defendant's age and absence of prior record); *United States v. Willis*, 322 F. Supp. 2d 76, 83 (D. Mass. 2004) (tax evasion; downward departure from guideline offense level of 17 to offense level of 10, "in order to give [defendant] a sentence of probation [with six months home detention]", based in part on age; noting, *inter alia*, disproportionality of indiscriminate application of guidelines

31

calculus with respect to an older offender, who "will lose a greater percentage of their lives than a younger [offender] and may suffer more from the same sentence").  *See also, United States v. Greene*, 249 F. Supp. 2d 262 (S.D. N.Y. 2003) (" it is highly unlikely that Greene will repeat his criminal conduct given that he is sixty-five year[s] old and previously had no criminal history points. For all of these reasons, any period of incarceration would be inappropriate"); *United States v. Hernandez*, No. 03 CR 1257 (RWS), 2005 WL 1242344, at *5 (S.D.N.Y. 2005) (departing downward from a guidelines range of 70-87 months to 50 months, based on fact defendant was 49 years old and had no prior criminal record and was therefore lower risk for recidivism); *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (noting guidelines' failure to account for the fact that recidivism drops substantially with age); *United States v. Nellum*, No. 02:04 CR 30-PS, 2005 WL 300073, at *3 (N.D.Ind. 2005) (citing United States Sentencing Commission report, finding recidivism rates "decline consistently as age increases," with the empirical evidence indicating a recidivism rate for offenders over age fifty (9.5%) at a fraction of that for offenders under age 21 (35.5%)).

It should be noted that most of the foregoing decisions were rendered prior to *Booker*, and that all of them were rendered at a time that the departure provision with respect to the factor of age (§ 5H1.1) included the admonition that age "is not ordinarily relevant in determining whether a departure is warranted."  That statement was eliminated in 2010, and replaced with the current language indicating, to the contrary, that age is a factor that "may be relevant in determining whether a departure is warranted." Fed. Sent. Guidelines Manual, Vol. 3 (West 2010), p. 348 (Amendment 739).  The Commission adopted that amendment in view of the practices of many sentencing judges in being forced to resort to variances in order to accommodate such factors, and following the Commission's review of sentencing data, case law,

scholarly literature and public comment and feedback. *Id.*, p. 350.

At age 62 -- nearly 63 years of age (in less than three months) -- Lee Ferguson is well outside the heartland of defendants the age-blind sentencing table is "usual[ly]" or "typical[ly]" applied to. *See* USSG Ch. 5, Pt. H, Introductory Commentary.  The fact that he has led an "otherwise law-abiding life," PSR ¶ 71, with a well-deserved "stellar reputation," PSR ¶ 77, for all those years, in itself supports a downward departure and/or variance.

**4. Lee's Cooperation with the Government and Efforts to Address his Substance Abuse Problem Warrant a Downward Variance**

As reflected in the judgments issued by this Court in a number of recent cases, a defendant's cooperation with the Government and assistance in the investigation of the case (*United States v. Mir*, 3:18-cr-41-MPS, ECF No. 28; *United States v. Warga*, 3:14-cr-240-MPS, ECF No. 38); efforts to address addiction issues (*United States v. Siwek*, 3:14-cr-183-MPS, ECF No. 47; *United States v. Warga, supra*); and early payment of restitution ( *United States v. Capecelatro*, 3:17-cr-262-MPS, ECF No. 20-1; *United States v. Rozycki*, 3:17-cr-212-MPS, ECF No. 33), provide support in an appropriate case for a below-Guidelines sentence.  Here, Lee Ferguson has taken all of those actions, meeting and working with the Government to facilitate the resolution of the case, *see* p. 21, *supra*, attending regular sessions at the Wheeler clinic with noted progress, *see* sealed Ex. 1, accompanying the Motion to Seal submitted herewith, and completing payment of restitution in full in advance of sentencing.  When coupled with the downward departure factors identified above, his personal history and characteristics, and the other mitigating §3553 factors discussed herein, and Lee's otherwise law-abiding life and stellar career in building and leading an organization that has been such a central part of his life and those of his many employees and the community in which they reside over the past 40 years, it is respectfully submitted a sentence substantially below the Guidelines range is appropriate in this

case.

### D) The Remaining Sentencing Factors Support a Below-Guidelines Sentence

18 U.S.C. § 3553(a) requires the Court to consider several other factors in fashioning an appropriate sentence, including the need for the sentence to reflect the seriousness of the crime, to provide just punishment, to afford adequate deterrence, and to protect the public from future crimes; the availability of alternative sentences; the need to avoid unwarranted sentencing disparities; and the need to provide restitution. 18 U.S.C. § 3553(a)(2), (3), (6), (7). These factors, in combination with Lee's history and characteristics and the nature and circumstances of his offense, *see* 18 U.S.C. § 3553(a)(1), are particularly important in this case because the Sentencing Guidelines do not provide any reasonable guidance regarding the appropriate sentence. *Adelson*, 441 F. Supp. 2d at 515.

#### 1. The Unique and Individualized Background and Circumstances of this Offense

As the Guidelines themselves recognize, fraud statutes "cover a broad range of conduct with extreme variation in severity." U.S.S.G. § 2B1.1, Background note (2018). A salient feature of the present case is that the victims of the misconduct for which Lee Ferguson faces sentencing are the very people he has been instrumental in benefitting over his entire adult life. The Ferguson companies that he led and developed (and, in the case of Ferguson Mechanical, created in its entirety, now with over 120 employees in itself) have been, and continue to serve as, a mainstay for many of those same employees.

Jacqueline Ferguson, Lee's 89-year-old mother, who, with her late husband, oversaw the initial company when it was far smaller, describes the challenges with which they contended from an early stage:

> [W]e were not a union contractor which meant that we needed to maintain
> our tradesmen through good times, and bad. We weren't required to do this,
> we had to, in that these were townspeople, people whose families we knew

> and who we saw daily at shops, our children's schools and weekly at our
> church were our responsibility, as much as Dale or Lee. There was no way
> our misfortune either in a single mistaken bid price, a customer who refused
> to pay, or the economy overall, was going to result in any employee losing
> their salary, we simply found work, or took work cheaper to maintain work,
> and insure jobs. . . . Though we initially worked on non-prevailing rate jobs
> in the earlier years, throughout Tom's time, and later Lee's, our focus was to
> bid largely prevailing rate work so that we could afford to reward the better
> skilled electricians with higher paying projects to ensure top pay, and
> continual employment.

A-003.

She goes on to describe the pressures that came with the expansion of the companies, and

the problems with maintaining enough work to keep the employees gainfully employed. A-003-

04.  While amazed by Lee's innate management skills, in retrospect she notes the toll it took on

Lee and his personal life – a toll to which she in part ascribes the difficulties in which Lee now

finds himself.  But as the letters of the employees and members of the Plainville community

make clear, Lee's long history of support and genuine affection for these same employees says

more about who he is than the transgression that has led to his departure,  and they accordingly

express sadness and disappointment that he will no longer remain at the helm, *see. e.g.*, A-072;

A-087, notwithstanding the misconduct that is now public knowledge.[12]

In what is an important part of the acceptance of responsibility as a result of which Lee

will now stand before the Court for sentencing, in the course of acknowledging his misconduct,

he is also coming to terms with the personal failings that allowed him to engage in it – the

rationalizations, the disregard of adverse impact on those he genuinely cared about, and his

violation of the law. PSR, ¶18. At the risk of overstepping areas of the undersigneds'

---

[12] In the same vein, Tim Pilkington writes:

> [Lee] has always, as long as I have known him, care[d] more about his employees, their
> families, and their general well-being more than any boss I've ever heard of. . . . No matter
> what the outcome of any issues in regards to lee, I cannot say one negative word against the
> man that has kept me gainfully employed for 31+ years, and an employer that I can truly call
> my friend.

A-084-85.

competence, those same failings appear in some measure related to the substance abuse issues

Lee is also in the process of addressing.  Taken together with the caring and support Lee has

provided to so many, this case cries out for the nuanced treatment that the Supreme Court so

famously noted to be the hallmark of sentencing in the federal courts: consideration of "every

convicted person as an individual and every case as a unique study in the human failings that

sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v.*

*United States*, 518 U.S. 81, 113 (1996).

### 2.   Any Sentence of Imprisonment Will Reflect the Seriousness of the Offense and Provide Just Punishment

18 U.S.C. § 3553(a)(2)(A) directs the Court to consider the need for the sentence

imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide

just punishment for the offense." Lee has already suffered greatly as a result of this case.   He

has been publicly humiliated and he will live the rest of his life a branded felon. He has resigned

from the only career he has ever known and he has lived the past few years under the cloud of

prosecution.  A brief sentence of imprisonment, substantially below the Guidelines range, would

amply satisfy this sentencing factor.

### 3.   Any Sentence of Imprisonment Will Provide for Adequate Deterrence

A lengthy sentence of imprisonment will not promote general or specific deterrence.

As set forth above, Lee fully understands the wrongfulness of his actions and poses no risk of

offending again. Thus, specific deterrence is not a factor in this case.

As for general deterrence, social science research indicates that long prison sentences

do not promote general deterrence. Some studies have found no difference between the

deterrent effects of probationary and prison sentences. *See* David Weisburd, et al., *Specific*

*Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587

(1995). While more recent studies indicate that a sentence of imprisonment may promote general deterrence, these same studies have found no marginal deterrent effect from more severe prison sentences. *See, e.g.*, Michael Tony, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28–29 (2006) (noting that three National Academy of Sciences panels found no significant marginal deterrent effect from lengthier sentences); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448– 49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

Instead, potential white-collar offenders are much more likely to be deterred by informal sanctions, such as shame and loss of career. *See* Gabbay, 8 Cardozo J. Conflict Resol. at 449 & nn. 132, 133 (citing studies finding that civil penalties and informal sanctions are more effective than imprisonment at promoting deterrence among white-collar offenders). Courts from this Circuit have recognized that substantial prison sentences do not promote deterrence among white-collar offenders. *Adelson*, 441 F. Supp. 2d at 514 (finding, in case with 85-year Guidelines range, that a three-and-a-half-year sentence for a $50 million accounting fraud, along with the attendant civil penalties and personal consequences, was more than adequate to promote deterrence).[13] Given the enormous personal consequences Lee has already suffered and will continue to suffer for the rest of his life from his conviction, a long prison sentence is simply unnecessary to promote deterrence.

---

[13] As in the present case, the mitigating factors in Adelson included the fact that a number of the victims themselves, who suffered adverse financial consequences from the offense, wrote to the court on Adelson's behalf, describing his commitment to the company and its mission, and the fact that Adelson's good deeds were not performed to gain status or enhance his image, but were genuine reflections of true character, "unknown to all but a few people until the time of sentencing." 441 F. Supp. 2d at 513.

### 4. Lee Poses No Risk of Offending Again

Following his guilty plea, Lee resigned from the companies that have been the focus of his entire adult life, and relinquished all ownership interests. At age 62, he recognizes that he will not be returning to work in the construction industry. As such, there is no chance that he will ever commit an offense such as this in the future. Nor does Lee pose any risk to society more generally. As the PSR notes, the present offense was an anomaly in an otherwise law-abiding life, over the long course of which Lee was a stellar fixture in the greater Plainville community. Indeed, a sentence of imprisonment is more likely to harm Lee's community than to protect it, depriving his friends, family, and neighbors of a hard-working, respected, and dedicated member of the community. This factor counsels against a lengthy sentence of imprisonment.

### 5. The Availability of Other Sentences

18 U.S.C. § 3553(a)(3) directs courts to consider "the kinds of sentences available" in fashioning an appropriate sentence. As the PSR recognizes, Lee is statutorily eligible for a term of probation of 1 to 5 years. PSR ¶ 60; 18 U.S.C. § 3561(a), (c)(1).[14] Courts in white- collar cases have recognized that a sentence of probation may more appropriately satisfy the requirements of 18 U.S.C. § 3553(a) than a term of imprisonment. *See United States v. Brady*, No. 02 CR 1043(JG), 2004 WL 86414, at *8–9 (E.D.N.Y. Jan. 20, 2004). Counsel for Lee Ferguson respectfully request that the Court consider a sentence of probation, with a requirement that Lee perform extensive community service for an extended period.

#### a. Support for Community Service Sentences

A sentence of community service is strongly encouraged in appropriate cases. The

---

[14] The PSR also correctly notes that a probationary sentence is not authorized by the advisory Sentencing Guidelines. PSR ¶ 61; U.S.S.G. § 5B1.1, Application Note 2.

Administrative Office of the United States Courts has observed that community service is "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair — a 'win-win' proposition for everyone involved." Court & Community: An Information Series about U.S. Probation and Pretrial Services: Community Service, Office of Probation and Pretrial Services, Administrative Office of the U.S. Courts (2007), available at www.kywp.uscourts.gov/court_comm/ccmtysvc.pdf.

"Community service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation ...It restricts offenders' personal liberty[,] ... allows offenders to atone, [and] ... may be regarded as ... a form of symbolic restitution when the community is the victim." *Id*. In selecting an appropriate candidate to perform community service, the Office of Probation and Pretrial Services recommends:

> ...[C]ourts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. Not every offender is a good candidate for community service...*Courts look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence.*

*Id*. (Emphasis added). Lee Ferguson has personal and social stability, is extremely willing and motivated, and has absolutely no history of violence.

Sentencing judges have recognized that community service can serve as a significant sanction. In a case in the Eastern District of New York, where the defendant pled guilty to conspiracy to defraud financial institutions and others to the tune of over $100 million, former Judge John Gleeson spoke eloquently of the value of community service:

> The prospect of a sentence that does not include incarceration, which is explicit in the papers submitted by your lawyers, is a daunting one for no other reason than it might fail to promote respect for the law which is one of the things a sentence must do for someone who participated so integrally in a fraud from, as far as

your piece of it is concerned, cost financial institutions, what, $110 million.

\*\*\*

In fact, you know, one might say how could, no matter how essential you were to the prosecution of the more culpable participants in this crime, how do you justify an intelligent, accomplished businessman such as yourself committing this type of crime and not being sent to jail, not being, having the punishment include that type of condemnation, the most significant form of condemnation a sentencing judge in a financial crime can mete out?

But nothing should ever be out of bounds and I've struggled with your lawyer's request, struggled with it throughout the presentations I've heard here, and I conclude that a sentence that doesn't include incarceration is appropriate here. *Alternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive, given your significant charitable works and contributions before this case, given the extraordinary timing of your cooperation and its nature. . . . I don't think the goals of sentencing here require you to be incarcerated.*

I am placing you on probation for a period of five years. One special condition of probation would be that you be in home detention for a period of six months.

Another is that you perform 500 hours of community service. *It strikes me that you can do some good in your community. You already have. It seems to me you deserve it. The combination of circumstances in your case makes you worthy of serving your punishment in a manner that's a little more constructive than going to jail.*

Sentencing Transcript, *United States v. Shamilzadeh*, No. 04-CR-1094 (E.D.N.Y. Apr. 1, 2008) at pp. 10-12 (emphasis added).

More recently, 1 U.S. *Department of Justice Manual* (Wouters Kluwer 3d ed. 2017), Comment 1-2.000A, *U.S. Department of Justice Strategic Plan, Fiscal Years 2014-2018* (2017-3 Supplement), Objective 3.4 , includes "expanding the use of diversion programs," and states that, as one of its strategies to achieve this objective, "The Department is taking steps to identify and

share best practices for enhancing the use of diversion programs, *such as . . . community service initiatives that can serve as effective alternatives to incarceration.*"

Courts have also recently been more inclined to impose sentences of probation with community service as an alternative to incarceration in appropriate cases. One of the more recent cases is *United States v. Samson*, Crim. No. 2:16-00334-JLL-1, a highly-publicized case in which the Chairman of the Port Authority of New York/New Jersey pled guilty to knowingly and corruptly accepting bribes from United Airlines in exchange for favorable treatment. The government in *Samson* argued for a sentence of two years imprisonment. Nevertheless, on March 6, 2017, Judge Jose Linares sentenced the defendant to four years of probation, with 12 months home confinement, and 3,600 hours of community service over the term of probation. Another example is *United States v. Chatwal*, CR-14-00143 (E.D.N.Y. Dec. 18, 2014), in which Judge Ira Glasser sentenced the defendant, who pled guilty to providing straw donors with illegal campaign contributions, resulting in an advisory Guidelines range of 46-47 months, to 1,000 hours of community service with an agency that helped youth obtain employment after imprisonment on Rikers Island.

Finally, community service as an alternative has also been used in the Western District of New York for first-time offenders. In February 2014, the Honorable Frank P. Geraci, Jr. sentenced a defendant to probation and home confinement with the expectation that he would continue his community service with a camp for disabled and autistic children in Rochester, New York. This defendant plead guilty to a $2.5 million tax evasion charge and had an advisory sentencing guideline range of 30-37 months (United States vs. John Gizzi: 6:13 CR 06046-0001). Prior to sentencing, Mr. Gizzi had performed over 100 hours of community service with the Sunshine Camp, a program of the Rochester Rotary Club. Post-sentencing, he performed

over 2,000 hours of additional community service.

These authorities all indicate that probation with community service is an appropriate sentence, and all of these cases highlight the value to the community that first-time offenders like Lee Ferguson can provide.

### b.    Community Service is an Appropriate Sentence for Lee Ferguson

Lee Ferguson fully understands the consequences of his criminal conduct and has demonstrated to those who know him well that his remorse is deeply felt and genuine; he will never re-offend. For all the reasons set forth in this memorandum, we submit that a sentence of incarceration is not necessary to satisfy the goals and purposes of sentencing. As an alternative, we recommend a sentence of probation with community service for Lee Ferguson with Community Partners in Action, a nonprofit organization in Hartford, Connecticut whose mission is to provide an array of services for returning citizens and to advocate for criminal justice reform.

For over 140 years, Community Partners in Action (CPA) has focused on behavioral change for individuals involved in Connecticut's criminal justice system while also striving to reduce recidivism, enhance public safety, advocate reform, and inform policy. Working in conjunction with many partners, CPA provides services in basic needs, recovery, and employment to positively impact lives and help those they serve successfully reenter society. The organization works in partnership with the State of Connecticut, the United States government, private funders, organizations and businesses and serves thousands of men, women and youth annually. CPA runs prevention, intervention, employment and reentry programs in Hartford, Hamden, Manchester, Waterbury, Connecticut as well as in Connecticut's Correctional Institutions.

The organization works to address the many obstacles faced by someone leaving prison life. Newly released prisoners need a suitable place to live, medical insurance, access to mental and physical health care, a job, access to transportation, assistance rebuilding social networks and support systems, etc. CPA has always believed that people can change, and that those who have served time in the criminal justice system, can change for the better no matter the odds against them. Experience with thousands of prisoners, year after year, has confirmed this belief to all who work at CPA. For the great majority of individuals served by CPA, change for a better life is not only possible; it is real. CPA staff members view clients with a respectful regard that believes in their potential, and CPA program participants are held accountable as they set goals to rebuild their lives. While CPA clients' pasts are not ignored, they are also not judged. And CPA staff members view themselves as providing a community of partners who will walk program participants toward a new and better life.

CPA provides intensive case management, cognitive therapy, substance use relapse prevention, transitional housing, artistic, cultural and educational enrichment, employment services, and community service projects. In 2018, over 6,000 adults and youth participated in CPA programs. All programs promote recovery, restoration and responsibility while helping participants learn to think differently and to make better choices. Programs include:

> **The Resettlement Program**-provides comprehensive reentry case management and basic needs support services, such as food, clothing, substance use and mental health treatment

> **Transitional Housing Programs**-prepares individuals to adjust to independent living in the future by taking ownership of a shared living environment

> **The Prison Arts Program**-promotes self-expression through visual arts classes, exhibitions and publications

> **The Culinary Training Program**-prepares individuals for careers in culinary arts and hospitality industries

> ➤ **Reentry and Employment Services**-specifically for people returning to the Hartford, CT area- provides skills assessments, job hunting preparation, and career certification training

> ➤ **The Work Release Program**-provides preparation for work readiness, job search, job retention assistance, life skills training, money management/banking, and access to educational and vocational opportunities

Through Lee Ferguson's leadership, Ferguson Electric currently works in partnership with CPA as it provides an apprenticeship program in the electrical and HVAC trades for some of CPA's clients. Many hurdles to finding a good, well-paying job exist for those involved with the criminal justice system, including few marketable skills, lack of job readiness, limited or no access to job training programs, and many businesses and organizations not willing to hire individuals with criminal records. Many leave the doors of prison only to reenter a society with closed doors before them. Through his creation of an apprenticeship program at Ferguson Electric, Lee Ferguson has willingly opened a door and created a viable pathway for individuals interested in learning trade skills. CPA clients who demonstrate the aptitude and desire to train for a career as an electrician or HVAC technician can apply to join Ferguson Electric's apprenticeship program and prepare for careers in these profitable fields.

Tradespeople earn excellent hourly wages, dramatically higher than minimum wage, and because they have valuable, marketable skills, often, they can easily find stable, secure employment opportunities. Helping reentering citizens find their way into the trades through well-structured apprenticeship programs where they can ultimately become licensed and certified in a specific field will unquestionably change the trajectory of these individuals' lives for the better. Stable jobs lead to stable incomes, and stable incomes lead to stable lives. A good paying job is not a panacea for success or a problem-free life, but a good paying job sets a solid foundation upon which one can build a productive and meaningful life full of promise.

44

To date, one of CPA's clients has already spent approximately nine months in Ferguson's apprenticeship program learning the sheet metal trade. This individual has grown tremendously through this experience and is on track to eventually become certified as an HVAC technician. His life has taken a dramatic turn for the better, and once he completes his training, he will face a future with highly marketable skills and excellent job prospects.

We ask the Court to consider a sentence of probation with community service for Lee Ferguson with Community Partners in Action so that the partnership between the two organizations can continue to grow as it increases the number of CPA clients enrolled in Ferguson's apprenticeship program. With more apprentices training in the electrical or HVAC fields, more lives will be changed for the better. There is no question that returning citizens face a great number of challenges as they attempt to begin their lives anew by: establishing better coping strategies, developing more effective problem-solving skills, finding secure housing, accessing good health care, building healthy personal relationships, and finding good jobs where they can earn decent wages and ultimately create meaningful, purposeful, successful lives. Through this apprenticeship program, Lee Ferguson and Ferguson Electric could play a significant role in helping CPA clients attain those meaningful, purposeful, successful lives.

### 6.  The Need To Avoid Unwarranted Sentence Disparities

18 U.S.C. § 3553(a)(6) directs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." This factor therefore requires the Court to consider the sentences imposed on similar first-time offenders. Although every case and every offender are unique, this statutory factor does not require identity between offenders but only a rough similarity. And the sentences imposed in similar cases show that the sentence of imprisonment suggested by the Guidelines is disproportionate and unwarranted.

Counsel for Lee Ferguson are unaware of any exact parallels to Lee's case. But similar offenders convicted of wire fraud or money laundering appear to consistently receive below-Guidelines sentences of a few years' imprisonment. For example, in *United States v. Ferguson*, four defendants were convicted of creating sham reinsurance contracts, which allowed AIG to issue misleading financial statements regarding its loss reserves. The disclosure of these sham transactions caused AIG shareholders to lose at least $544 million. 584 F. Supp. 2d 447, 456 (D. Conn. 2008). Nevertheless, Judge Droney issued substantially below-Guidelines sentences to the four defendants of between one to four years. Similarly, in *United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006), the defendant participated in corporate financial fraud, which caused an intended loss of more than $50 million to the company's shareholders. Despite a Guidelines range of 85 years' imprisonment (the statutory maximum), Judge Rakoff imposed a sentence of three and a half years. *Id.* at 514–15. And in a recent case involving money laundering by a Connecticut lawyer, where the Guideline range was in excess of 100 months, and a departed Guidelines range of 87-108 months, Judge Hall imposed a sentence of two and a half years' imprisonment, despite a jury trial in which the defendant's testimony was deemed perjurous. *United States v. Crozier*, 3:13-cr-113-JCH, ECF No. 99. Other examples can easily be multiplied, but these cases show that below Guidelines sentences for first-time white-collar offenders who are unlikely to offend again are the norm, in part because the Guidelines' loss table results in patently unreasonable sentences even in the mine- run case.

Empirical evidence shows that these examples are not unusual. Data from the U.S. Sentencing Commission demonstrates that below-Guidelines sentences for defendants sentenced under U.S.S.G. § 2B1.1 are common. Allenbaugh, *Drawn from Nowhere*, 26 Fed. Sent'g Rep. at 20 (discussing evidence showing that fraud offenders received below-Guidelines

sentences more often than offenders from any other major offense category). Indeed, the empirical evidence shows that fraud offenders whose offense level results primarily from loss amounts are more likely to receive below-Guidelines sentences than offenders with an identical offense level derived from other enhancements, *id.* at 23 – findings that continue to be reflected in very recent Sentencing Commission data. United States Sentencing Commission, 2018 Annual Report and Sourcebook of Federal Sentencing Statistics 159, Table E-7 (2018) (in fiscal year 2018, sentencing nationwide under § 2B1.1 resulted in variances nearly 40% of the time).

### 7. The Need To Provide Restitution

As noted above, Lee Ferguson has already paid restitution, in accordance with Schedule A attached as a sealed exhibit to the plea agreement, and restitution is accordingly not an issue. However, it is respectfully submitted that the prompt and complete restitution paid here, in advance of sentencing, is another factor that weights in favor of a substantially below-Guidelines sentence, in addition to the reasons set forth above.

### IV.   CONCLUSION

Based on the foregoing, including the aberrational nature of the present offense, against the backdrop of more than 40 years of law-abiding conduct, hard work, mentoring and support for employees, family and his community, Lee poses absolutely no risk of ever offending again. The Court should consider Lee's personal history and the details of his offense in fashioning an appropriate sentence, particularly because the advisory Sentencing Guidelines do not provide meaningful guidance in this case. For these reasons, counsel for Lee Ferguson respectfully request that the Court impose a sentence that will allow Lee to remain a positive force in the life of his family and his community.

Respectfully submitted,

                          */s/ Kenneth Rosenthal*
                          Kenneth Rosenthal (ct05944)
                          Law Office of Kenneth Rosenthal
                          One Audubon Street, 3d Fl.
                          New Haven, CT 06511
                          Tel: (203) 915-4235
                          Email krosenthal@gs-lawfirm.com

                          William F. Dow, III
                          Jacobs Dow
                          350 Orange Street
                          New Haven, CT 06511
                          Tel: (203) 772-3100
                          Email wdow@jacobslaw.com

                          *Counsel for Defendant, Lee Ferguson*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 16, 2020, a copy of the foregoing, and accompanying Exhibits A-C, were filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Kenneth Rosenthal*
Kenneth Rosenthal (ct05944)
